**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1350**

JAMES K. SANDERFORD,

       Plaintiff - Appellant,

    v.

DUPLIN LAND DEVELOPMENT, INC.,

       Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville.  Malcolm J. Howard, Senior District Judge.  (7:10-cv-00230-H)

Argued:  May 16, 2013          Decided:  July 2, 2013

Before DUNCAN and KEENAN, Circuit Judges, and David C. NORTON, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Samuel B. Potter, BROADWELL, PHILLIPS & POTTER, PLLC, Wrightsville Beach, North Carolina, for Appellant.  Reginald Bernard Gillespie, Jr., WILSON & RATLEDGE, PLLC, Raleigh, North Carolina, for Appellee.  **ON BRIEF:** George L. Fletcher, Aimee L. Ezzell, FLETCHER, RAY & SATTERFIELD, L.L.P., Wilmington, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

James K. Sanderford appeals the district court's order granting summary judgment to Duplin Land Development, Inc. ("DLD") on his claims for specific performance, unfair and deceptive trade practices, fraud, and violation of the Interstate Land Sales Full Disclosure Act. For the reasons that follow, we affirm the judgment of the district court.

I.

In 2006, Sanderford signed a lot reservation agreement to reserve a parcel of land in the "Bluffs" section of River Landing, a residential development owned by DLD in Duplin County, North Carolina. Sanderford was subsequently informed that environmental testing had uncovered the presence of fecal coliform bacteria in the groundwater and some soil samples in the Bluffs. DLD advised Sanderford that he could not enter into a formal lot purchase contract until the fecal coliform had deteriorated to acceptable levels.

DLD retained the Clark Group to conduct an environmental assessment. In February 2007, the Clark Group delivered a report to DLD, finding that the Bluffs would be suitable for residential development pending the completion of a natural degradation process associated with fecal coliform. Based on this finding, DLD decided to allow those with existing lot

reservation agreements to enter into purchase contracts even though the fecal contamination had not sufficiently subsided. DLD believed that the fecal contamination levels would degrade with time and the lots would be suitable for construction by the fall.

Sanderford received a proposed lot purchase agreement that contained an "Addendum B." Addendum B disclosed that fecal coliform was present in the Bluffs because, among other reasons, it had been used as a swine production facility. Addendum B further provided that no construction activities would commence until the Clark Group, or another qualified environmental consulting firm, undertook additional sampling and testing and issued a "Confirmatory Report" that the fecal coliform levels had degraded to acceptable levels. Addendum B contained the following remedy provision:

> If, the Seller does not receive the Confirmatory Report and notify Purchaser of the same by November 1, 2007, then the Seller and Purchaser will agree to (1) terminate the Contract and return all monies deposited, thereby mutually releasing the Seller and Purchaser from all obligations; or (ii) to the extent available, Seller will allow the Purchaser to apply the full purchase price of the Lot to another lot within River Landing and will pay the same closing costs in such transaction as Seller paid at the original purchase of the Lot all as shown on the Settlement Statement for the closing on the Lot. (iii) Seller will return all monies, including all closing cost[s] to Purchaser. This provision shall survive the

3

> closing of the transaction contemplated herein.[1]

J.A. 468-69.[2]

Along with the proposed lot purchase agreement, Sanderford received a HUD Property Report. Like Addendum B, the HUD Report disclosed that "[f]ecal coliform was found in some surface and ground water, in one soil sample and in a high concentration in the mulch on the property." J.A. 432. Also like Addendum B, the HUD Report advised purchasers that they "will not be permitted to commence construction activities on any lots within the Bluffs until [DLD] obtain[s] a written report from a consultant indicating that the previously identified fecal coliform has degraded to an acceptable level." Id.

Notwithstanding the known presence of fecal coliform in the Bluffs, Sanderford executed his lot purchase agreement. Closing took place in September 2007, with DLD paying the closing costs and fees.

Meanwhile, the Clark Group continued to monitor fecal colofirm levels by taking water and soil samples at the Bluffs. However, according to Sanderford, the Clark Group discontinued

---

[1] Subsection (iii) was added as a handwritten notation by Sanderford.

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

its sampling activities after May 2007, at which point DLD conducted its own "in-house" testing.[3]

In October 2007, the Clark Group was satisfied that the fecal coliform levels at the Bluffs had subsided. The Clark Group compiled its findings in a report to the Division of Water Quality ("DWQ") of the North Carolina Division of Environment and Natural Resources. DWQ reviewed the Clark Group's report and determined that contamination levels were "substantially lower" than when first discovered. DWQ concluded that "the most recent surface water samples are compliant with established standards and only one monitoring well showed slightly above groundwater standards. The current conditions indicate that no additional monitoring is needed at this time and the matter can be considered closed." J.A. 471.

On October 31, 2007, DLD mailed letters informing those with lot purchase contracts in the Bluffs that it had received a "Confirmatory Report" from DWQ. DLD additionally advised

---

[3] DLD explains that having the Clark Group perform all of the sampling activities became cost prohibitive. Beginning in August 2007, DLD instructed employees of a sister company to assist the Clark Group in drawing water from test wells in the Bluffs. The samples were submitted to a lab, after which the lab results were given to the Clark Group for analysis. Appellee's Br. 13; see also J.A. 387-88 (Aff. of Stephen L. Clark).

purchasers that their properties were suitable for construction. Sanderford did not receive the letter until November 3, 2007.

Nearly a year later, beginning in September 2008, Sanderford sent letters to DLD demanding a full refund of all payments. The letters went unanswered. Over two years later, on November 28, 2010, Sanderford filed suit in federal district court.

## II.

We review a grant of summary judgment de novo, applying the same standards as the district court. Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 433 (4th Cir. 2013). In reviewing a grant of summary judgment, we view all facts and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 119-20 (4th Cir. 2011). Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013).

## III.

Sanderford contends the district court erred in granting summary judgment to DLD on all claims.

6

First, Sanderford argues that the district court erred in granting summary judgment to DLD on his claim for specific performance of Addendum B. DLD counters that Addendum B constitutes an unenforceable "agreement to agree."

To claim a right to specific performance under North Carolina law, a claimant must initially establish the existence of a valid contract. Munchak Corp. v. Caldwell, 273 S.E.2d 281, 285 (N.C. 1981). A contract is only valid if the contracting parties "have agreed on all material terms of the contract." Boyce v. McMahan, 208 S.E.2d 692, 695 (N.C. 1974). "It is well settled that a contract 'leaving material portions open for future agreement is nugatory and void for indefiniteness.'" Cnty. of Jackson v. Nichols, 623 S.E.2d 277, 279 (N.C. Ct. App. 2005) (quoting Boyce, 208 S.E.2d at 695). "If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement." Boyce, 208 S.E.2d at 695 (emphasis added) (internal quotation marks omitted).

Here, Addendum B provides that if the purchaser is not notified by November 1, 2007 that DLD received a Confirmatory Report, then the seller and purchaser "will agree" to either terminate the contract and return all monies deposited or allow the purchaser to apply the purchase price of the lot to another lot within River Landing, to the extent available. The clear

7

and unambiguous language of the contract shows that the parties agreed to agree on one of two options, rather than on a definitive remedy.[4] Addendum B contains no method for a court to determine which remedy to apply in the event of a breach. It is an unenforceable contract because it fails to specify all material terms. See N.C. Nat'l Bank v. Wallens, 217 S.E.2d 12, 15 (N.C. Ct. App. 1975).

Sanderford refers to the HUD Report as contemporaneous evidence of the parties' intent to agree on a particular remedy. However, the HUD Report simply refers to the choice of remedies in Addendum B. See J.A. 432 (HUD Report reference to Addendum B); J.A. 456 (HUD Report's listing of same options as Addendum B).

Because it is lacking in mutual assent on all essential terms, Addendum B is an unenforceable agreement to agree. Therefore, the district court did not err in granting summary judgment to DLD on Sanderford's claim for specific performance of Addendum B.

---

[4] We refer to two, rather than three, potential remedies in Addendum B because the third subsection added as a handwritten notation by Sanderford is duplicative of the language found in subsection (i). See supra note 1 and accompanying text.

8

B.

Second, Sanderford argues that the district court erred in holding that DLD did not breach the notice requirement found in Addendum B. As stated above, Addendum B is an unenforceable contract; therefore, DLD cannot be found to have breached its provisions.

Even if Addendum B were an enforceable contract, we find that DLD substantially fulfilled its obligation to provide notice of its receipt of the Confirmatory Report by November 1, 2007. "In order for a breach of contract to be actionable it must be a <u>material</u> breach, one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a <u>substantial</u> failure to perform." <u>Long v. Long</u>, 588 S.E.2d 1, 4 (N.C. Ct. App. 2003) (emphasis added). On October 31, 2007, DLD sent notice that it had received a Confirmatory Report and that the Bluffs was suitable for construction. This notice was received by Sanderford a mere two days after the deadline. DLD substantially complied with its obligation to notify purchasers that the fecal coliform levels had subsided and construction activities could commence.[5]

---

[5] Moreover, Sanderford has not provided any explanation for why he was prejudiced by a two-day delay in receiving the notice letter.

For these reasons, we agree with the district court that Sanderford did not breach Addendum B and that Sanderford is not entitled to specific enforcement of the contract.

C.

Third, Sanderford contends that the district court erred in granting summary judgment to DLD on his claims for fraud and unfair and deceptive trade practices.

The elements of a claim for fraud under North Carolina law include a showing that the defendant made a false representation or concealment of a material fact and harbored an intent to deceive. Whisnant v. Carolina Farm Credit, 693 S.E.2d 149, 156-57 (N.C. Ct. App. 2010). Similarly, the elements of a claim for unfair and deceptive trade practices include a showing that the defendant performed acts that possess a tendency or capacity to mislead or create a likelihood of deception. Overstreet v. Brookland, Inc., 279 S.E.2d 1, 7 (N.C. Ct. App. 1981).

In support of his claims, Sanderford alleges that DLD misrepresented that the Clark Group would conduct all sampling and monitoring activities at the Bluffs. Yet, DLD never promised that the Clark Group would conduct all sampling or that a wholly "independent" group would conduct sampling; to the contrary, Addendum B states that the Clark Group, "or other qualified consulting firm," would undertake sampling until fecal

10

coliform levels degraded to an acceptable level. J.A. 343 (emphasis added). Sanderford makes no argument why the sampling performed by employees of DLD's sister company was inadequate. Moreover, the Clark Group was involved in the monitoring and assessment of fecal coliform levels at all relevant times, reviewing the lab results from samples drawn by the sister company's employees. It was the Clark Group that submitted its findings to DWQ and precipitated the Confirmatory Report.

Sanderford also contends that DLD misrepresented that it received a satisfactory Confirmatory Report from DWQ, since DWQ's letter mentions that "one monitoring well showed slightly above groundwater standards." J.A. 471. The fact that one well showed slight contamination did not stop DWQ from indicating that "no additional monitoring is needed" and considering the matter "closed." Id. The letter from DWQ complies on all fours with DLD's promise in Addendum B to present a Confirmatory Report indicating that fecal coliform levels had "degraded to an acceptable level." J.A. 469. DLD fairly represented DWQ's analysis in its letter to Sanderford and properly advised Sanderford that his property was "suitable for construction." J.A. 473.

Sanderford has failed to establish any false representations or concealment of material facts made by DLD; intent to deceive on the part of DLD; or acts by DLD possessing

11

a tendency or capacity to mislead performed by DLD. Therefore, the district court properly granted summary judgment on Sanderford's claims for fraud and unfair trade practices.

D.

Finally, Sanderford contends that the district court erred in granting summary judgment to DLD on his claim for violation of the Interstate Land Sales Full Disclosure Act ("ILSFDA").

The ILSFDA "is a remedial statute enacted to prevent interstate land fraud and to protect unsuspecting and ill-informed investors from buying undesirable land." Long v. Merrifield Town Ctr. Ltd. P'ship, 611 F.3d 240, 244 (4th Cir. 2010). "To this end, the statute requires that specified disclosures be made prior to a purchaser's execution of a sales contract." Id. The Act provides disclosures requirements, 15 U.S.C. § 1703(a)(1), and anti-fraud provisions, 15 U.S.C. § 1703(a)(2). Sanderford only proceeds under § 1703(a)(2).

While a claim for common law fraud and a claim for violation of the ILSFDA's anti-fraud provisions are not identical, they share the common requirement that Sanderford prove DLD made material misrepresentations or omissions

12

concerning its sale of land.[6]  As detailed above, Sanderford has not shown that DLD's actions amounted to fraud because he fails to set forth any evidence of false representations or concealment of material facts by DLD.  We therefore hold that the district court did not err in granting summary judgment to DLD on Sanderford's ILSFDA claim.

IV.

Based on the foregoing, we affirm the judgment of the district court.

AFFIRMED.

---

[6] Each of Sanderford's assertions that DLD violated the ILSFDA rests on a claim that DLD made a material misrepresentation or omission.  See Compl. ¶ 67.

13